**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RICHEMONT INTERNATIONAL SA, CARTIER INTERNATIONAL A.G., MONTBLANC-SIMPLO GMBH, CHLOE S.A.S., VAN CLEEF & ARPELS SA, and OFFICINE PANERAI A.G., | ) ) ) ) ) ) | Case No. 18-cv-02588 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| THE PARTNERSHIPS and UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE "A," | ) ) ) ) | |
| Defendants. | ) ) | |

**COMPLAINT**

Plaintiffs RICHEMONT INTERNATIONAL SA, CARTIER INTERNATIONAL A.G., MONTBLANC-SIMPLO GMBH, CHLOE S.A.S., VAN CLEEF & ARPELS SA, and OFFICINE PANERAI A.G. (collectively, "Plaintiffs") hereby bring the present action against the Partnerships and Unincorporated Associations identified on Schedule A attached hereto (collectively, "Defendants") and allege as follows:

**I. JURISDICTION AND VENUE**

1.     This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051, *et seq.*, 28 U.S.C. § 1338(a)-(b) and 28 U.S.C. § 1331.  This Court has jurisdiction over the claims in this action that arise under the laws of the State of Illinois pursuant to 28 U.S.C. § 1367(a), because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

2.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants since each of the Defendants directly targets business activities toward consumers in the United States, including Illinois, through at least the fully interactive, commercial Internet stores operating under the Defendant Domain Names and/or the Online Marketplace Accounts identified in Schedule A attached hereto (collectively, the "Defendant Internet Stores").  Specifically, Defendants are reaching out to do business with Illinois residents by operating one or more commercial, interactive Defendant Internet Stores through which Illinois residents can purchase products using counterfeit versions of Plaintiffs' respective trademarks.  Each of the Defendants has targeted sales from Illinois residents by operating online stores that offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, has sold counterfeit products using counterfeit versions of Plaintiffs' respective trademarks to residents of Illinois.  Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused Plaintiffs substantial injury in the State of Illinois.

## II. INTRODUCTION

3.     Plaintiffs are all subsidiaries of Compagnie Financière Richemont SA ("Richemont"), which owns several of the world's leading companies in the field of luxury goods, with particular strengths in jewelry, luxury watches and writing instruments.  This action has been filed by Plaintiffs to combat online counterfeiters who trade upon Plaintiffs' respective reputations and goodwill by selling and/or offering for sale unauthorized and unlicensed counterfeit products using counterfeits of Plaintiffs' trademarks (the "Counterfeit Products").  The Defendants create the Defendant Internet Stores by the hundreds and design them to appear to be selling Plaintiffs' genuine products, while actually selling Counterfeit Products to

unknowing consumers. The Defendant Internet Stores share unique identifiers, such as design elements and similarities of the Counterfeit Products offered for sale, establishing a logical relationship between them and suggesting that Defendants' counterfeiting operation arises out of the same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid liability by going to great lengths to conceal both their identities and the full scope and interworking of their counterfeiting operation. Plaintiffs are forced to file these actions to combat Defendants' counterfeiting of their respective registered trademarks, as well as to protect unknowing consumers from purchasing Counterfeit Products over the Internet. Plaintiffs have been and continue to be irreparably damaged through consumer confusion, dilution, and tarnishment of their valuable trademarks as a result of Defendants' actions and seek injunctive and monetary relief.

## III. THE PARTIES

**Plaintiffs**

**Plaintiff Cartier**

4.      Plaintiff CARTIER INTERNATIONAL A.G. is a corporation organized and existing under the laws of Switzerland, having its principal place of business at Hinterbergstrasse 22, 6312 Steinhausen, Switzerland ("Cartier"). Cartier is a subsidiary of Richemont.

5.      Cartier is one of the preeminent symbols of luxury in the world. Since at least as early as 1847, Cartier and its predecessors-in-interest and associated companies have been using the CARTIER trademark on and in connection with the advertising and sale of luxury products, including, *inter alia*, watches, watch buckles, clocks, jewelry, scarves, handbags, eyewear, pens, letter openers, perfumes, and cigarette lighters (collectively, the "CARTIER Products").

6.     CARTIER Products are distributed and sold to consumers through over 300 Cartier boutiques, including one located at 630 N. Michigan Avenue in Chicago, Illinois, as well as through thousands of authorized retailers worldwide.  Cartier has for some time operated a website where it promotes genuine CARTIER Products at cartier.us and cartier.com.  More recently, these websites have offered e-commerce of CARTIER Products via the cartier.us and cartier.com websites.  The cartier.us and cartier.com websites feature proprietary content, images and designs exclusive to Cartier.

7.     Cartier incorporates a variety of distinctive marks in the design of its various CARTIER Products.  As a result of its long-standing use, Cartier owns common law trademark rights in its CARTIER trademarks.  Cartier has also registered its trademarks with the United States Patent and Trademark Office.  CARTIER Products typically include the CARTIER registered trademark.  Cartier uses its trademarks in connection with the marketing of its CARTIER Products, including the following marks which are collectively referred to as the "CARTIER Trademarks."

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| 411,975 | *Cartier* | February 13, 1945 | For:  Watches and clocks and wrist watches with wrist straps and bracelets attached for securing the same on the wrist of the wearer, and traveling clocks and watches with covers of leather, fabric and the like for protecting them while traveling in class 014. |
| 415,184 | *Cartier* | July 31, 1945 | For:  Reading glasses in class 009. |
| 759,201 | CARTIER | October 29, 1963 | For:  Watches and clocks in class 014. |

4

| 759,202 | CARTIER | October 29, 1963 | For: Articles of jewelry for personal wear, not including watches; and the following goods of solid or plated silverware-namely, hollow-ware, jewelry cases, and buckles in classes 008 and 014. |
|---|---|---|---|
| 1,005,286 | LOVE BRACELET | February 25, 1975 | For: Jewelry-namely, bracelets in class 014. |
| 1,114,482 |  | March 6, 1979 | For: Articles of jewelry, watches and clocks in class 014. |
| 1,372,423 |  | November 26, 1985 | For: Bracelets in class 014. |
| 3,162,410 |  | October 24, 2006 | For: Jewelry, namely, bracelets, watches, rings, charms, earrings in class 014. |
| 3,637,776 |  | June 16, 2009 | For: Goods of precious metals and coated therewith, namely, cuff-links, rings, bracelets, earrings, necklaces in class 014. For: Leatherware, namely, wallets in class 018. For: Clothing, namely, scarves in class 025. |
| 3,776,794 |  | April 20, 2010 | For: Jewelry, namely, rings, bracelets, charms, earrings, made of precious metals in class 014. |

| 4,178,047 | *Cartier* | July 24, 2012 | For: Jewelry and watches in class 014. |
| 4,988,729 | CARTIER | June 28, 2016 | For: Sunglasses, eyeglass frames in class 009. |

8.    The CARTIER Trademarks have been used exclusively and continuously by Cartier and its predecessors-in-interest and associated companies in the U.S., some since at least as early as 1859, and have never been abandoned.  The above registrations for the CARTIER Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065.  Attached hereto as **Exhibit 1** are true and correct copies of the U.S. Registration Certificates for the CARTIER Trademarks included in the above table.  The registrations for the CARTIER Trademarks constitute *prima facie* evidence of their validity and of Cartier's exclusive right to use the CARTIER Trademarks pursuant to 15 U.S.C. § 1057(b).

**Plaintiff Montblanc**

9.    Plaintiff MONTBLANC-SIMPLO GMBH is a corporation organized and existing under the laws of Germany, having its principal place of business at Hellgrundweg 100 22525 Hamburg, Germany ("Montblanc").  Montblanc is a subsidiary of Richemont.

10.    Montblanc is an internationally recognized manufacturer, distributor and retailer of high quality writing instruments, watches and other goods, all of which prominently display its famous, internationally-recognized and federally-registered trademarks, including MONTBLANC (collectively, the "MONTBLANC Products").

11.    MONTBLANC Products are distributed and sold to consumers through a worldwide network of Montblanc boutiques and other tightly-controlled distribution partnerships.  In 2011, Montblanc established an e-commerce site in the United States at montblanc.com.  Montblanc also launched an e-commerce platform in Europe, covering France,

The United Kingdom, and Germany. Sales of MONTBLANC Products via the montblanc.com website represent a significant portion of Montblanc's business. The montblanc.com website features proprietary content, images and designs exclusive to Montblanc.

12. Montblanc incorporates a variety of distinctive marks in the design of its various MONTBLANC Products. As a result of its long-standing use, Montblanc owns common law trademark rights in its MONTBLANC trademarks. Montblanc has also registered its trademarks with the United States Patent and Trademark Office. MONTBLANC Products typically include at least one of Montblanc's registered trademarks. Montblanc uses its trademarks in connection with the marketing of its MONTBLANC Products, including the following marks which are collectively referred to as the "MONTBLANC Trademarks."

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| 776,208 | MONTBLANC | September 1, 1964 | For: Fountain pens, cases for fountain pens, ball point pens, ball point cartridges, ball point paste, mechanical pencils, lead for mechanical pencils in class 016. |
| 839,016 |  | November 21, 1967 | For: Fountain pen ink in class 002.<br><br>For: Fountain pens, cases for fountain pens, ball point pens, ball point cartridges, mechanical pencils, lead for mechanical pencils, desk stands for pens in class 016. |
| 1,324,392 | MEISTERSTUCK | March 12, 1985 | For: Fountain pens, ballpoint pens and mechanical pencils including sets thereof, all made partially with precious metals and sold in specialty stores in class 016. |

| 1,825,001 | MONTBLANC | March 8, 1994 | For: Spectacles and sunglasses in class 009. |
|---|---|---|---|
| 1,878,584 |  | February 14, 1995 | For: Jewelry, watches and timepieces in class 018.<br><br>For: Purses, handbags, small leather articles and accessories, namely wallets and billfolds, and luggage in class 018. |
| 1,884,842 | MONTBLANC | March 21, 1995 | For: Jewelry, watches and timepieces in class 014.<br><br>For: Purses, handbags, small leather articles and accessories, namely wallets and billfolds, and luggage in class 018. |
| 2,415,189 | MONTBLANC | December 26, 2000 | For: clothing accessories, namely, dress belts made of leather with belt buckles of precious and semi-precious metals distributed in channels of commerce where luxury articles are sold and promoted in class 025. |
| 2,515,092 |  | December 4, 2001 | For: stationery, namely, writing paper, writing cards in class 016. |
| 2,747,460 | **MEISTERSTÜCK** | August 05, 2003 | For: Jewelry, cuff-links, and tie bars in class 014. |
| 2,759,073 | STARWALKER | September 2, 2003 | For: Fountain pens, ball-point pens, pencils, felt-tip pens, rollerballs in class 016. |
| 3,021,088 | 4810 | November 29, 2005 | For: Watches, wristwatches, chronometers, jewelry articles, namely, earrings, rings, necklaces in class 014.<br><br>For: Writing instruments, in particular, fountain pens, in class |

| | | | |
|---|---|---|---|
| | | | 016. |
| 3,059,776 | MONT BLANC | February 21, 2006 | For: Money clips, key rings all being made of metal in class 006. |
| 3,659,753 | | July 28, 2009 | For: Writing instruments, namely, pens in class 016. |
| 4,295,116 | MONT BLANC | February 26, 2013 | For: Retail store services featuring watches, writing instruments and parts and fittings therefor, writing inks and refills for writing instruments, leather goods, belts, jewelry, eyewear, fragrances, stationery, stationery refills, desk sets, personal care products; online retail store services featuring watches, writing instruments, writing inks and refills for writing instruments, leather goods, belts, jewelry, eyewear, fragrances, stationery, stationery refills in class 035. |
| 4,359,666 | 4810 | July 2, 2013 | For: Eyeglasses, sunglasses, eyeglass frames and cases; graduated rulers in class 009.<br><br>For: Jewellery articles, namely, bracelets, cufflinks in class 014.<br><br>For: Document markers; pouches for writing instruments; inks and ink refills for writing instruments; diaries; personal organizers; paperweights; pen and pencil holders in class 016.<br><br>For: Belts in class 025. |
| 4,582,264 | MONTBLANC | August 12, 2014 | For: Retail store services in the field of luxury goods in the nature |

of watches, chronometers, luxury writing instruments and parts and fittings therefor, leather goods, belts, jewelry, eyewear, fragrances, stationery, stationery refills, desk sets, personal care products provided via the Internet and other computer and electronic communication networks in class 035.

For: Telecommunication services, namely, routing of Internet queries from end users to website hosting providers; providing access to an online computer database in the field of domain name registration information; connection of Internet domains and e-mail-addresses in computer networks, namely, data communication by electronic mail in class 038.

For: Technical IT project management services for managing and tracking computer network domain names in connection with the registration of domain names for identification of users and Internet protocol addresses on the Internet; verification of identities for the purpose of permitting or denying access to information and services in the nature of computer security services, namely, enabling or restricting access to computer networks to authorized users by means of a website featuring technology that verifies user identities; Internet Protocol (IP) address verification in class 042.

For: Legal services, namely,

| | | | |
|---|---|---|---|
| | | | registration of domain names for identification of users on a global computer network; registration services enabling entities to manage information related to domain names and e-mail addresses for use on a global computer network, namely, issuing and registration of domain names and e-mail addresses; licensing of domain names; legal services, namely, administration of domain names and e-mail addresses in class 045. |
| 4,669,133 |  | January 13, 2015 | For: Soaps; perfumery; essential oils; cosmetic preparations for body and beauty care in class 003.<br><br>For: Eyeglasses, sunglasses; eyeglass frames and cases; magnifying glasses; computer and tablets carrying cases and bags; holders and cases for telephones, portable telephones and smartphones; accessories for portable telephones, smartphones and tablets, namely, cases, bags; data recording and storage media device and instruments, namely, blank USB flash drive; graduated rulers in class 009.<br><br>For: Jewelry; precious stones; precious metals and their alloys; cufflinks; tie clips; rings; bracelets; earrings; necklaces; brooches; key rings of precious metal; jewelry cases; boxes of precious metals; horological and chronometric instruments; watches; chronometers; clocks; small clocks; watch cases; watch bands; watch bracelets; key rings, trinkets, or fobs of precious metal |

| | | | |
|---|---|---|---|
| | | | in class 014.<br><br>For: Stationery; articles of paper or cardboard, namely, boxes, bags, envelopes and pouches for packaging; wrapping paper; writing instruments; pouches for writing instruments; cases for writing instruments; inks and ink refills for writing instruments; desk sets; writing books; calendars, note books, card and document files, announcement cards; writing paper, envelopes, index cards; business cards; writing pads; writing instrument holders; paperweights; diaries, cover for diaries, replacement papers for diaries; inkwells; check book holders, passport holders; document holders and cases; photo albums; bookends; money clips; writing cases for writing instruments in class 016.<br><br>For: Handbags, travelling bags, rucksacks, garment bags for travel, traveling sets comprised of luggage, suitcases, bags for sports, wheeled bags, wallets, purses, name cards cases, briefcases, attaché cases, key cases of leather or imitation leather; travelling trunks; unfitted vanity cases; evening purses; leather straps; boxes of leather or leather board, trunks and suitcases; credit card holder in class 018. |
| 5,127,048 | STARWALKER | January 24, 2017 | For: Leather and imitation leather, goods made in these materials and not included in other classes, namely, leather bags, leather pouches; handbags, |

| | | | travelling bags, rucksacks, school bags, traveling sets, namely, leather luggage; bags for sports, wheeled bags, wallets, purses, credit card holders, briefcases, suitcases, attaché-cases, key holders, namely, key cases; travelling trunks, vanity cases, not fitted; evening purses, boxes of leather or leather board in class 018. |
|---|---|---|---|

13.     The MONTBLANC Trademarks have been used exclusively and continuously by Montblanc in the U.S., some since at least as early as 1913, and have never been abandoned. The above registrations for the MONTBLANC Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065.  Attached hereto as **Exhibit 2** are true and correct copies of the U.S. Registration Certificates for the MONTBLANC Trademarks included in the above table.  The registrations for the MONTBLANC Trademarks constitute *prima facie* evidence of their validity and of Montblanc's exclusive right to use the MONTBLANC Trademarks pursuant to 15 U.S.C. § 1057(b).

**Plaintiff Chloe**

14.     Plaintiff CHLOE S.A.S. is a corporation organized and existing under the laws of France, having its principal place of business at 5-7 Av. Percier 75008 Paris, France ("Chloe"). Chloe is a subsidiary of Richemont.

15.     Chloe is an internationally recognized manufacturer, distributor and retailer of high-quality fashion apparel, jewelry, handbags, and other accessories and related goods, all of which prominently display its famous, internationally-recognized and federally-registered trademarks, including CHLOE (collectively, the "CHLOE Products").  CHLOE Products have become enormously popular and even iconic, driven by Chloe's arduous quality standards and innovative design.   Among the purchasing public, genuine CHLOE Products are instantly

13

recognizable as such. In the United States and around the world, the Chloe brand has come to symbolize high quality, and CHLOE Products are among the most recognizable luxury products in the world.

16. CHLOE Products are distributed and sold to consumers through a worldwide network of select authorized Chloe online retailers, dealers, boutiques, and at finer department stores such as Bergdorf Goodman, Bloomingdale's, Nordstrom, Barneys New York, and Saks Fifth Avenue. Chloe also promotes the CHLOE Products online at chloe.com. The chloe.com website features proprietary content, images and designs exclusive to Chloe.

17. Chloe incorporates a variety of distinctive marks in the design of its various CHLOE Products. As a result of its long-standing use, Chloe owns common law trademark rights in its CHLOE trademarks. Chloe has also registered its trademarks with the United States Patent and Trademark Office. CHLOE Products typically include at least one of Chloe's registered trademarks. Chloe uses its trademarks in connection with the marketing of its CHLOE Products, including the following marks which are collectively referred to as the "CHLOE Trademarks."

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| 950,843 | Chloé | January 16, 1973 | For: Ladies' articles of clothing for outerwear-namely, frocks, dresses, coats, costumes, suits, skirts, blouses, vests and pant-suits, vests, and ladies' shoes in classes 010, 025, 026. |
| 1,491,810 | CHLOE | June 14, 1988 | For: Perfume toilet water, cologne, body lotion, body cream, personal deodorant, and beauty or bath soap in class 003.<br><br>For: Handbags, and purses in class |

| | | | |
|---|---|---|---|
| | | | 018.<br><br>For: Bathrobes, bathing suits, coats, dresses, hats, jackets, shirts, blouses, trousers, skirts, scarves, and shoes in class 025. |
| 1,925,176 | CHLOE | October 10, 1995 | For: Sunglasses, cases and containers for such sunglasses in class 009. |
| 2,641,982 | SEE BY CHLOE | October 29, 2002 | For: Travelling bags, holdalls, tote bags, handbags, credit card case, purses, wallets, key cases, coin purses, parts and fittings for all the aforesaid goods in class 018.<br><br>For: Clothing, namely, trousers, skirts, suits, dresses, jackets, blousons, shirts, coats, cardigans, sweaters, blouses, shorts, t-shirts, pullovers, and scarves in class 025. |
| 2,745,487 | CHLOE | April 5, 2003 | For: Jewelry in class 014. |
| 3,198,388 | CHLOE | January 16, 2007 | For: Optical apparatus and instruments, namely, spectacles, sunglasses, eyeglasses, eye shades, and frames, earpieces, lenses, cords, chains, cases and containers therefore in class 009. |
| 3,921,204 | LOVE, Chloé | February 15, 2011 | For: Perfumery, perfumes in class 003. |
| 4,348,622 | SeeBy Chloé | June 11, 2013 | For: Perfumery, perfumes, toilet water, eau-de-Cologne, scented water for perfume, shower and bath gels, bubble bath, toilet soaps, Personal deodorants, cosmetics in the nature of face, body and hand creams, milks, lotions, gels and powders, beauty masks, liquid creams for the body, essential oils, oils for perfumes and scents for body |

| | | | care, make-up preparations, lipsticks, foundations, pencils for the eyes, eyebrow and lips, eye shadows, mascara, eyeliners, nail varnish, shampoos, hair conditioners, hair styling and hair care preparations, and make-up removing preparations in class 003. |
|---|---|---|---|
| 4,853,384 | DREW | November 17, 2015 | For: Wallets, coin purses, handbags, card cases, namely, business card cases, calling card cases, and name card cases; key cases, backpacks, clutch bags, beach bags; shopping bags, namely, canvas shopping bags, and leather shopping bags in class 018. |

18.     The CHLOE Trademarks have been used exclusively and continuously by Chloe in the U.S., some since at least as early as 1973, and have never been abandoned. The above registrations for the CHLOE Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065. Attached hereto as **Exhibit 3** are true and correct copies of the U.S. Registration Certificates for the CHLOE Trademarks included in the above table. The registrations for the CHLOE Trademarks constitute *prima facie* evidence of their validity and of Chloe's exclusive right to use the CHLOE Trademarks pursuant to 15 U.S.C. § 1057(b).

**Plaintiff Van Cleef & Arpels**

19.     Plaintiff Van Cleef & Arpels, S.A. is a corporation organized and existing under the laws of Switzerland, having its principal place of business at 8 Route des Biches, 1752 Villars-sur-Glane, Switzerland ("Van Cleef & Arpels"). Van Cleef & Arpels is a subsidiary of Richemont.

20.     Established in France in 1906, Van Cleef & Arpels and its predecessors-in-interest and associated companies have been doing business under the VAN CLEEF & ARPELS name and mark for more than 100 years.  Since its inception, Van Cleef & Arpels has been known for its innovative, highly artistic and high-quality luxury jewelry and timepieces (the "VAN CLEEF & ARPELS Products").

21.     The VAN CLEEF & ARPELS Products are sold through more than 100 Van Cleef & Arpels points of sale, including one located at 933 North Michigan Avenue in Chicago, Illinois, and through a network of authorized retailers worldwide.  VAN CLEEF & ARPELS Products are also promoted and sold online at vancleefarpels.com. The vancleefarpels.com website features proprietary content, images and designs exclusive to Van Cleef & Arpels.

22.     Van Cleef & Arpels incorporates a variety of distinctive marks in the design of its various VAN CLEEF & ARPELS Products.  VAN CLEEF & ARPELS Products typically include at least one of the Van Cleef & Arpels registered trademarks.  Van Cleef & Arpels uses its trademarks in connection with the marketing of its VAN CLEEF & ARPELS Products, including the following marks which are collectively referred to as the "VAN CLEEF & ARPELS Trademarks."

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| 1,415,794 | Van Cleef & Arpels | Nov. 04, 1986 | For: Jewelry and watches in class 014. |
| 1,584,572 | VCA | Feb. 27, 1990 | For: Jewelry in class 014. |
| 2,692,672 |  | Mar. 04, 2003 | For: Jewelry; watches; in class 014. |

17

| | | | |
|---|---|---|---|
| 2,751,878 | ALHAMBRA | Aug. 19, 2003 | For: Precious metal and their alloys and products made thereof or coated therewith not included in other classes, namely, jewelry, horological and chronometric instruments, namely, watches and watch bracelets and necklaces, jewelry chains of precious metal, earrings, jewelry rings, pendants, ankle bracelets, cuff links, studs made of precious metal in class 014. |
| 2,936,247 | VAN CLEEF & ARPELS | Mar. 29, 2005 | For: Items made of precious metal, namely, rings, bracelets, earrings, necklaces, pendants, charms, brooches, clips, hairclips, jewelry boxes, jewelry cases, watch bracelets and buckles; jewelry, watches and clocks in class 014.<br><br>For: Retail shops featuring jewelry and watches in Class 035. |
| 3,489,019 | ALHAMBRA | Aug. 19, 2008 | For: jewelry; clock and watch making, namely, watches, watch bracelets, clocks, horological and chronometric instruments in class 014. |
| 4,037,174 |  | Oct. 11, 2011 | For: Jewelry in class 014.<br><br>For: Retail store services featuring jewelry in class 035. |

| | | | |
|---|---|---|---|
| 4,653,258 | | Dec. 09, 2014 | For: Jewelry in class 014.<br><br>For: Retail store services featuring jewelry in Class 035. |
| 4,326,883 | | Apr. 30, 2013 | For: Jewelry in class 014. |
| 4,763,030 | | June 30, 2015 | For: Jewelry; rings; pendants; earrings; necklaces; bracelets in class 014. |
| 5,029,940 | | August 30, 2016 | For: watches in class 014. |

23.     Van Cleef & Arpels is the owner of the entire right, title and interest in and to the VAN CLEEF & ARPELS Trademarks. The VAN CLEEF & ARPELS Trademarks have been used exclusively and continuously by Van Cleef & Arpels in the U.S., some since at least as early as 1939, and have never been abandoned. The above registrations for the VAN CLEEF & ARPELS Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065. Attached hereto as **Exhibit 4** are true and correct copies of the U.S. Registration Certificates for the VAN CLEEF & ARPELS Trademarks included in the above table. The registrations for the VAN CLEEF & ARPELS Trademarks constitute *prima*

19

*facie* evidence of their validity and of Van Cleef & Arpels' exclusive right to use the VAN CLEEF & ARPELS Trademarks pursuant to 15 U.S.C. § 1057(b).

**Plaintiff Panerai**

24.     Plaintiff OFFICINE PANERAI A.G. is a corporation organized and existing under the laws of Switzerland, having its principal place of business at Hinterbergstrasse 22, 6312 Steinhausen, Switzerland ("Panerai").  Panerai is a subsidiary of Richemont.

25.     Panerai is an internationally recognized manufacturer, distributor and retailer of high precision watches and professional divers' instruments, all of which prominently display its famous, internationally-recognized and federally-registered trademarks, including PANERAI (collectively, the "PANERAI Products").  PANERAI Products have become enormously popular and even iconic, driven by Panerai's arduous quality standards and innovative design.  Among the purchasing public, genuine PANERAI Products are instantly recognizable as such.  In the United States and around the world, the Panerai brand has come to symbolize high quality, and PANERAI Products are among the most recognizable watches in the world.

26.     PANERAI Products are distributed and sold to consumers through boutiques and a highly selective worldwide network of authorized Panerai dealers, such as Tourneau located at 835 North Michigan Avenue in Chicago, Illinois.  Panerai also promotes its distinctive designs and the PANERAI trademarks on its official website at panerai.com.  The panerai.com website features proprietary content, images and designs exclusive to Panerai.

27.     Panerai incorporates a variety of distinctive marks in the design of its various PANERAI Products.  As a result of its long-standing use, Panerai owns common law trademark rights in its PANERAI trademarks.  Panerai has also registered its trademarks with the United States Patent and Trademark Office.  PANERAI Products typically include at least one of

Panerai's registered trademarks. Panerai uses its trademarks in connection with the marketing of its PANERAI Products, including the following marks which are collectively referred to as the "PANERAI Trademarks."

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| 2,340,290 | PANERAI | April 11, 2000 | For: Chronometers, watches in class 014. |
| 2,418,830 | RADIOMIR | January 9, 2001 | For: Chronometers; watches and clocks in class 014. |
| 2,516,018 | LUMINOR | December 11, 2001 | For: Chronometers, watches and clocks in class 014. |
| 3,004,529 |  | October 4, 2005 | For: Boxes and cases for watches; chronometers, watches in class 014. |
| 3,174,281 | MARINA MILITARE | November 21, 2006 | For: watches, watchbands, wristwatches in class 014. |
| 3,857,560 | ZEROGRAPH | October 5, 2010 | For: Watches and chronometers in class 014. |
| 3,882,739 | RADIOMIR COMPOSITE | November 30, 2010 | For: Watches, watch straps, watch bracelets in class 014. |
| 3,889,408 | LUMINOR COMPOSITE | December 14, 2010 | For: Watches, watch straps, watch bracelets, boxes of precious metals for watches in class 014. |
| 4,009,035 | OFFICINE PANERAI | August 9, 2011 | For: Watches and clocks; watch accessories, namely, watch straps, and buckles for watch bands and watch straps in class 014. |

28. The PANERAI Trademarks have been used exclusively and continuously by Panerai and/or its predecessors-in-interest and associated companies in the U.S., some since at least as early as 2000, and have never been abandoned. The above registrations for the PANERAI Trademarks are valid, subsisting, in full force and effect, and many are incontestable

pursuant to 15 U.S.C. § 1065. Attached hereto as **Exhibit 5** are true and correct copies of the U.S. Registration Certificates for the PANERAI Trademarks included in the above table. The registrations for the PANERAI Trademarks constitute *prima facie* evidence of their validity and of Panerai's exclusive right to use the PANERAI Trademarks pursuant to 15 U.S.C. § 1057(b).

**Plaintiff Richemont International S.A.**

29.     Plaintiff RICHEMONT INTERNATIONAL S.A. is a corporation organized and existing under the laws of Switzerland, having its principal place of business at 10 Route des Biches, 1752 Villars-sur-Glane, Switzerland ("Richemont International S.A."). Richemont International S.A. is a subsidiary of Richemont.

30.     Richemont International S.A.'s Maisons or house brands include several of the most prestigious names in the luxury timepiece and jewelry industry: IWC Schaffhausen, Piaget, Baume & Mercier, Jaeger-LeCoultre, and Vacheron Constantin.

**Maison IWC**

31.     IWC was established nearly 150 years ago in Schaffhausen, Switzerland by the American Florentine Ariosto Jones, a watchmaker from Boston, Massachusetts. His initial aim: to produce high-quality pocket watches for the American market.   Since then, the IWC Swiss watch manufacturers have been creating masterpieces of haute horlogerie that combine precision engineering with exclusive design ("IWC Products"). IWC was acquired by Richemont International S.A. in 2000.

32.     IWC Products are sold worldwide at fine jewelers and department stores, including Torneau located at 835 N. Michigan Avenue in Chicago. IWC Products are also promoted online at iwc.com. The iwc.com website features proprietary content, images and designs exclusive to IWC and Richemont International S.A.

33.     IWC incorporates a variety of distinctive marks in the design of its various IWC Products. IWC Products typically include at least one IWC registered trademark. IWC uses its trademarks in connection with the marketing of its IWC Products, including the following marks which are collectively referred to as the "IWC Trademarks."

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| 1,205,403 | IWC | August 17, 1982 | For: Watches in class 014. |
| 2,516,587 | IWC *International Watch Co Schaffhausen* | December 11, 2001 | For: Watches and chronometers and parts for all of these goods in class 014. |
| 3,507,947 | IWC PORTUGIESER | September 30, 2008 | For: Watches and chronographs in class 014. |

34.     Richemont International S.A. is the owner of the entire right, title and interest in and to the IWC Trademarks. The IWC Trademarks have been used exclusively and continuously by IWC in the U.S., some since at least as early as 1901, and have never been abandoned. The above registrations for the IWC Trademarks are valid, subsisting, in full force and effect, and all are incontestable pursuant to 15 U.S.C. § 1065. Attached hereto as **Exhibit 6** are true and correct copies of the U.S. Registration Certificates for the IWC Trademarks included in the above table. The registrations for the IWC Trademarks constitute *prima facie* evidence of their validity and of Richemont International S.A.'s exclusive right to use the IWC Trademarks pursuant to 15 U.S.C. § 1057(b).

**Maison Piaget**

35.     The Piaget brand was established in Switzerland in 1874 and is well-known as a master of ultra-thin watch movement construction. Part of Richemont International S.A. since 1988, Piaget also has an established reputation in the jewelry field. Since the Piaget Maison was

23

established, Piaget has sold and distributed watches, watch parts and watch movements, clocks, chronometers, jewelry and other luxury goods (the "PIAGET Products").

36.     PIAGET Products are sold in Piaget boutiques and through other authorized retailers, including Trabert & Hoeffer in Chicago, Illinois.  Since at least as early as 1997, Piaget has operated a website where it promotes and sells genuine PIAGET Products at piaget.com. The piaget.com website features proprietary content, images and designs exclusive to Piaget and Richemont International S.A.

37.     Piaget incorporates a variety of distinctive marks in the design of its various PIAGET Products.  PIAGET Products typically include at least one Piaget registered trademark. Piaget uses its trademarks in connection with the marketing of its PIAGET Products, including the following marks which are collectively referred to as the "PIAGET Trademarks."

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| 679,984 | PIAGET | June 6, 1959 | For: complete watches, large clocks, pendulums in class 014. |
| 742,354 | PIAGET | Dec. 18, 1962 | For: Watches, watch parts and watch movements in Class 014. |

38.     Richemont International S.A. is the owner of the entire right, title and interest in and to the PIAGET Trademarks.  The PIAGET Trademarks have been used exclusively and continuously by Piaget in the U.S., some since at least as early as 1959, and have never been abandoned.  The above registrations for the PIAGET Trademarks are valid, subsisting, in full force and effect, and all are incontestable pursuant to 15 U.S.C. § 1065.  Attached hereto as **Exhibit 7** are true and correct copies of the U.S. Registration Certificates for the PIAGET

Trademarks included in the above table. The registrations for the PIAGET Trademarks constitute *prima facie* evidence of their validity and of Richemont International S.A.'s exclusive right to use the PIAGET Trademarks pursuant to 15 U.S.C. § 1057(b).

**Maison Baume & Mercier**

39. For many decades, Baume & Mercier and its predecessors-in-interest have been engaged in the manufacture and sale of watches, watch cases, watch movements, clocks, chronometers, and related goods (the "BAUME & MERCIER Products").

40. The Baume & Mercier Maison, first established in 1830 as Baume, has received numerous accolades throughout its history. Part of Richemont International S.A. since 1988, the Baume & Mercier brand's reputation for quality and style continues to this day.

41. BAUME & MERCIER Products are sold at fine jewelers and department stores, including Torneau located at 835 N. Michigan Avenue and Marshall Pierce & Co. located at 29 E. Madison Street in Chicago, Illinois. Since at least as early as 1995, Baume & Mercier has operated a website where it promotes genuine BAUME & MERCIER Products at baume-et-mercier.com. The baume-et-mercier.com website features proprietary content, images and designs exclusive to Baume & Mercier and Richemont International S.A.

42. Baume & Mercier incorporates a variety of distinctive marks in the design of its various BAUME & MERCIER Products. BAUME & MERCIER Products typically include at least one Baume & Mercier registered trademark. Baume & Mercier uses its trademarks in connection with the marketing of its BAUME & MERCIER Products, including the following marks which are collectively referred to as the "BAUME & MERCIER Trademarks."

25

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| 644,569 | BAUME & MERCIER GENEVE | Apr. 23, 1957 | For: Watches, watch cases, watch movements in class 014. |
| 1,081,643 | **Φ**<br>BAUME & MERCIER<br>GENEVE | January 10, 1978 | For: Watches, watch cases and watch movements in class 014. |
| 2,020,357 | BAUME & MERCIER LINEA | December 3, 1996 | For: Mechanical watches with manual and automatic winding; electric and electronic watches, movements, cases, dials, watch bands; diver's watches, chronometers; stop watches; clocks, travel clocks and electric and electronic alarm clocks, or with manual winding; jewel watches in class 014. |
| 3,371,339 | BAUME & MERCIER GENEVE | January 22, 2008 | For: Watches, watch cases in class 014. |
| 4,501,824 | BAUME & MERCIER | March 25, 2014 | For: Watches, chronometers, clocks, watch straps, watch bracelets, and boxes of precious metals for watches in class 014. |

43.     Richemont International S.A. is the owner of the entire right, title and interest in and to the BAUME & MERCIER Trademarks.  The BAUME & MERCIER Trademarks have been used exclusively and continuously by Baume & Mercier in the U.S., some since at least as early as 1946, and have never been abandoned.  The above registrations for the BAUME & MERCIER Trademarks are valid, subsisting, in full force and effect, and all are incontestable pursuant to 15 U.S.C. § 1065.  Attached hereto as **Exhibit 8** are true and correct copies of the U.S. Registration Certificates for the BAUME & MERCIER Trademarks included in the above table.  The registrations for the BAUME & MERCIER Trademarks constitute *prima facie*

evidence of their validity and of Richemont International S.A.'s exclusive right to use the BAUME & MERCIER Trademarks pursuant to 15 U.S.C. § 1057(b).

**Maison Jaeger-LeCoultre**

44.     Since its founding in 1833, Jaeger-LeCoultre has been at the forefront of invention and innovation in fine watchmaking and is now part of Richemont International S.A. Jaeger-LeCoultre sells and distributes watches and clocks (the "JAEGER-LECOULTRE Products") and has obtained hundreds of patents.

45.     JAEGER-LECOULTRE Products are sold via Jaeger-LeCoultre boutiques and fine jewelers, including Marshall Pierce & Co., Torneau, and Trabert & Hoeffer in Chicago, Illinois.   Since at least as early as 2000, Jaeger-LeCoultre has operated a website where it promotes and sells genuine JAEGER-LECOULTRE Products at jaeger-lecoultre.com.   The jaeger-lecoultre.com website features proprietary content, images and designs exclusive to Jaeger-LeCoultre and Richemont International S.A.

46.     Jaeger-LeCoultre incorporates a variety of distinctive marks in the design of its various JAEGER-LECOULTRE Products.   JAEGER-LECOULTRE Products typically include at least one Jaeger-LeCoultre registered trademark.   Jaeger-LeCoultre uses its trademarks in connection with the marketing of its JAEGER-LECOULTRE Products, including the following marks which are collectively referred to as the "JAEGER-LECOULTRE Trademarks."

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| 1,339,139 | JAEGER-LECOULTRE | June 4, 1985 | For: Watches and clocks except dashboard clocks for land vehicles, boats and planes in class 014. |
| 1,402,084 | JL JAEGER-LECOULTRE | July 22, 1986 | For: Watches and clocks except dashboard clocks for land vehicles, boats and planes in class 014. |

47. Richemont International S.A. is the owner of the entire right, title and interest in and to the JAEGER-LECOULTRE Trademarks. The JAEGER-LECOULTRE Trademarks have been used exclusively and continuously by Jaeger-LeCoultre in the U.S., some since at least as early as 1968, and have never been abandoned. The above registrations for the JAEGER-LECOULTRE Trademarks are valid, subsisting, in full force and effect, and both are incontestable pursuant to 15 U.S.C. § 1065. Attached hereto as **Exhibit 9** are true and correct copies of the U.S. Registration Certificates for the JAEGER-LECOULTRE Trademarks included in the above table. The registrations for the JAEGER-LECOULTRE Trademarks constitute *prima facie* evidence of their validity and of Richemont International S.A.'s exclusive right to use the JAEGER-LECOULTRE Trademarks pursuant to 15 U.S.C. § 1057(b).

**Maison Vacheron Constantin**

48. Since its founding in 1755, Vacheron Constantin has been involved in the sale and distribution of watches, chronometers, clocks, jewelry, and related goods (the "VACHERON CONSTANTIN Products"). Vacheron Constantin became part of Richemont International S.A. in 1996.

49. VACHERON CONSTANTIN Products are sold through Vacheron Constantin boutiques and a network of authorized retailers, including Trabert & Hoeffer in Chicago, Illinois. VACHERON CONSTANTIN Products are also promoted online at vacheron-constantin.com. The vacheron-constantin.com website features proprietary content, images and designs exclusive to Vacheron Constantin and Richemont International S.A.

50. Vacheron Constantin incorporates a variety of distinctive marks in the design of its various VACHERON CONSTANTIN Products. VACHERON CONSTANTIN Products typically include at least one of the Vacheron Constantin registered trademarks. Vacheron

Constantin uses its trademarks in connection with the marketing of its VACHERON CONSTANTIN Products, including the following marks which are collectively referred to as the "VACHERON CONSTANTIN Trademarks."

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| 3,114,414 | ✖ VACHERON CONSTANTIN | July 11, 2006 | For: Cuff links, watches, chronometers, clocks, watchstraps, cases of precious metal for watches and jewellery in class 014. |
| 4,564,316 | ✚ | July 8, 2014 | For: Watches and chronometers in class 014. |

51.     Richemont International S.A. is the owner of the entire right, title and interest in and to the VACHERON CONSTANTIN Trademarks. The VACHERON CONSTANTIN Trademarks have been used exclusively and continuously by Vacheron Constantin in the U.S. since at least as early as 2006 and have never been abandoned. The above registrations for the VACHERON CONSTANTIN Trademarks are valid, subsisting, in full force and effect, and some are incontestable pursuant to 15 U.S.C. § 1065. Attached hereto as **Exhibit 10** are true and correct copies of the U.S. Registration Certificates for the VACHERON CONSTANTIN Trademarks included in the above table. The registrations for the VACHERON CONSTANTIN Trademarks constitute *prima facie* evidence of their validity and of Richemont International S.A.'s exclusive right to use the VACHERON CONSTANTIN Trademarks pursuant to 15 U.S.C. § 1057(b).

**Plaintiffs' Trademarks and Plaintiffs' Products**

52.     The CARTIER Trademarks, MONTBLANC Trademarks, CHLOE Trademarks, VAN CLEEF & ARPELS Trademarks, PANERAI Trademarks, IWC Trademarks, PIAGET

Trademarks, BAUME & MERCIER Trademarks, JAEGER-LECOULTRE Trademarks, and VACHERON CONSTANTIN Trademarks are collectively referred to herein as "Plaintiffs' Trademarks."

53.    The CARTIER Products, MONTBLANC Products, CHLOE Products, VAN CLEEF & ARPELS Products, PANERAI Products, IWC Products, PIAGET Products, BAUME & MERCIER Products, JAEGER-LECOULTRE Products, and VACHERON CONSTANTIN Products are collectively referred to herein as "Plaintiffs' Products."

54.    Plaintiffs' Trademarks are exclusive to Plaintiffs, and are displayed extensively on Plaintiffs' Products and in Plaintiffs' marketing and promotional materials. Plaintiffs' Products have long been among the most popular luxury products in the world and have been extensively promoted and advertised at great expense. In fact, Plaintiffs have expended millions of dollars annually in advertising, promoting and marketing featuring their respective Plaintiffs' Trademarks. Plaintiffs' Products have also been the subject of extensive unsolicited publicity resulting from their high-quality, innovative designs and renown as desired luxury items. Because of these and other factors, Plaintiffs' respective brands and many of Plaintiffs' Trademarks have become famous.

55.    Plaintiffs' Trademarks are distinctive when applied to Plaintiffs' Products, signifying to the purchaser that the products come from Plaintiffs and are manufactured to Plaintiffs' quality standards. Whether Plaintiffs manufacture the products themselves or license others to do so, Plaintiffs have ensured that products bearing their trademarks are manufactured to the highest quality standards. Many of Plaintiffs' Trademarks have achieved tremendous fame and recognition, which has only added to the inherent or acquired distinctiveness of their

respective marks.  As such, the goodwill associated with Plaintiffs' Trademarks is of incalculable and inestimable value to Plaintiffs.

56.     Plaintiffs have expended substantial time, money, and other resources in developing, advertising and otherwise promoting Plaintiffs' Trademarks.  As a result, Plaintiffs' Products bearing Plaintiffs' Trademarks are widely recognized and exclusively associated by consumers, the public, and the trade as being high-quality products sourced from Plaintiffs. Each Plaintiff runs a multi-million dollar operation, and Plaintiffs' Products have become among the most popular of their kind in the world.

**The Defendants**

57.     Defendants are individuals and business entities who, upon information and belief, reside in the People's Republic of China or other foreign jurisdictions.  Defendants conduct business throughout the United States, including within the State of Illinois and this Judicial District, through the operation of the fully interactive commercial websites and online marketplaces operating under the Defendant Internet Stores.  Each Defendant targets the United States, including Illinois, and has offered to sell, and, on information and belief, has sold and continues to sell Counterfeit Products to consumers within the United States, including the State of Illinois.

58.     On information and belief, Defendants are an interrelated group of counterfeiters working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell products using counterfeit versions of Plaintiffs' Trademarks in the same transaction, occurrence, or series of transactions or occurrences.  Tactics used by Defendants to conceal their identities and the full scope of their counterfeiting operation make it virtually impossible for Plaintiffs to learn Defendants' true identities and the exact interworking of their

counterfeit network. In the event that Defendants provide additional credible information regarding their identities, Plaintiffs will take appropriate steps to amend the Complaint.

## IV. DEFENDANTS' UNLAWFUL CONDUCT

59.     The overwhelming success of Plaintiffs' respective brands has resulted in their significant counterfeiting. Consequently, Plaintiffs have a worldwide anti-counterfeiting program and regularly investigate suspicious websites and online marketplace listings identified in proactive Internet sweeps and reported by consumers. In recent years, Plaintiffs have identified thousands of domain names linked to fully interactive websites and marketplace listings on platforms such as iOffer, eBay, AliExpress and Alibaba, including the Defendant Internet Stores, which were offering for sale and selling Counterfeit Products to consumers in this Judicial District and throughout the United States. Despite Plaintiffs' enforcement efforts, Defendants have persisted in creating the Defendant Internet Stores. Internet websites like the Defendant Internet Stores are estimated to receive tens of millions of visits per year and to generate over $135 billion in annual online sales. According to an intellectual property rights seizures statistics report issued by Homeland Security, the manufacturer's suggested retail price (MSRP) of goods seized by the U.S. government in fiscal year 2014 was over $1.23 billion. Internet websites like the Defendant Internet Stores are also estimated to contribute to tens of thousands of lost jobs for legitimate businesses and broader economic damages such as lost tax revenue every year.

60.     Defendants facilitate sales by designing the Defendant Internet Stores so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers. Many of the Defendant Internet Stores look sophisticated and accept payment in U.S. dollars via credit cards, Alipay, Western Union and PayPal. The Defendant Internet Stores often include

content and design elements that make it very difficult for consumers to distinguish such counterfeit sites from an authorized website. Many Defendants further perpetuate the illusion of legitimacy by offering customer service and using indicia of authenticity and security that consumers have come to associate with authorized retailers, including the Visa®, MasterCard®, and/or PayPal® logos. Plaintiffs have not licensed or authorized Defendants to use any of the Plaintiffs' Trademarks, and none of the Defendants are authorized retailers of genuine Plaintiffs' Products.

61. Many Defendants also deceive unknowing consumers by using Plaintiffs' Trademarks without authorization within the content, text, and/or meta tags of their websites in order to attract various search engines crawling the Internet looking for websites relevant to consumer searches for Plaintiffs' Products. Additionally, upon information and belief, Defendants use other unauthorized search engine optimization (SEO) tactics and social media spamming so that the Defendant Internet Stores listings show up at or near the top of relevant search results and misdirect consumers searching for genuine Plaintiffs' Products. Other Defendants only show Plaintiffs' Trademarks in product images while using strategic item titles and descriptions that will trigger their listings when consumers are searching for Plaintiffs' Products.

62. Defendants go to great lengths to conceal their identities and often use multiple fictitious names and addresses to register and operate their network of Defendant Internet Stores. For example, many of Defendants' names and physical addresses used to register the Defendant Domain Names are incomplete, contain randomly typed letters, or fail to include cities or states. Other Defendant Domain Names use privacy services that conceal the owners' identity and contact information. On information and belief, Defendants regularly create new websites and

online marketplace accounts on various platforms using the identities listed in Schedule A to the Complaint, as well as other unknown fictitious names and addresses. Such Defendant Internet Store registration patterns are one of many common tactics used by the Defendants to conceal their identities, the full scope and interworking of their counterfeiting operation, and to avoid being shut down.

63.     Even though Defendants operate under multiple fictitious names, there are numerous similarities among the Defendant Internet Stores. For example, many of the Defendant websites have virtually identical layouts, even though different aliases were used to register the respective domain names. In addition, Counterfeit Products for sale in the Defendant Internet Stores bear similar irregularities and indicia of being counterfeit to one another, suggesting that the Counterfeit Products were manufactured by and come from a common source and that Defendants are interrelated. The Defendant Internet Stores also include other notable common features, including use of the same domain name registration patterns, shopping cart platforms, accepted payment methods, check-out methods, meta data, illegitimate SEO tactics, HTML user-defined variables, domain redirection, lack of contact information, identically or similarly priced items and volume sales discounts, the same incorrect grammar and misspellings, similar hosting services, similar name servers, and the use of the same text and images, including content copied from Plaintiffs' official websites.

64.     In addition to operating under multiple fictitious names, Defendants in this case and defendants in other similar cases against online counterfeiters use a variety of other common tactics to evade enforcement efforts. For example, counterfeiters like Defendants will often register new domain names or online marketplace accounts under new aliases once they receive notice of a lawsuit. Counterfeiters also often move website hosting to rogue servers located

outside the United States once notice of a lawsuit is received. Rogue servers are notorious for ignoring take down demands sent by brand owners. Counterfeiters also typically ship products in small quantities via international mail to minimize detection by U.S. Customs and Border Protection.

65.     Further, counterfeiters such as Defendants typically operate multiple credit card merchant accounts and PayPal accounts behind layers of payment gateways so that they can continue operation in spite of Plaintiffs' enforcement efforts. On information and belief, Defendants maintain off-shore bank accounts and regularly move funds from their PayPal accounts or other financial accounts to off-shore bank accounts outside the jurisdiction of this Court. Indeed, analysis of PayPal transaction logs from previous similar cases indicates that off-shore counterfeiters regularly move funds from U.S.-based PayPal accounts to China-based bank accounts outside the jurisdiction of this Court.

66.     Defendants, without any authorization or license from Plaintiffs, have knowingly and willfully used and continue to use Plaintiffs' Trademarks in connection with the advertisement, distribution, offering for sale, and sale of Counterfeit Products into the United States and Illinois over the Internet. Each Defendant Internet Store offers shipping to the United States, including Illinois, and, on information and belief, each Defendant has sold Counterfeit Products into the United States, including Illinois.

67.     Defendants' use of Plaintiffs' Trademarks in connection with the advertising, distribution, offering for sale, and sale of Counterfeit Products, including the sale of Counterfeit Products into the United States, including Illinois, is likely to cause and has caused confusion, mistake, and deception by and among consumers and is irreparably harming Plaintiffs.

## COUNT I
## TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)

68.     Plaintiffs hereby re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 67.

69.     This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of the federally registered Plaintiffs' Trademarks in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods.  Plaintiffs' Trademarks are highly distinctive marks.  Consumers have come to expect the highest quality from Plaintiffs' Products offered, sold or marketed under Plaintiffs' Trademarks.

70.     Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products using counterfeit reproductions of Plaintiffs' Trademarks without Plaintiffs' permission.

71.     Plaintiffs are the exclusive owners of their respective Plaintiffs' Trademarks. Plaintiffs' United States Registrations for their respective Plaintiffs' Trademarks (Exhibits 1-10) are in full force and effect.  Upon information and belief, Defendants have knowledge of Plaintiffs' rights in Plaintiffs' Trademarks, and are willfully infringing and intentionally using counterfeits of one or more of Plaintiffs' Trademarks.  Defendants' willful, intentional and unauthorized use of Plaintiffs' Trademarks is likely to cause and is causing confusion, mistake, and deception as to the origin and quality of the Counterfeit Products among the general public.

72.     Defendants' activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

73.     Plaintiffs have no adequate remedy at law, and if Defendants' actions are not enjoined, Plaintiffs will continue to suffer irreparable harm to their reputations and the goodwill of Plaintiffs' Trademarks.

74.     The injuries and damages sustained by Plaintiffs have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offering to sell, and sale of Counterfeit Products.

## COUNT II
## FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

75.     Plaintiffs hereby re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 74.

76.     Defendants' promotion, marketing, offering for sale, and sale of Counterfeit Products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with Plaintiffs or the origin, sponsorship, or approval of Defendants' Counterfeit Products by Plaintiffs.

77.     By using Plaintiffs' Trademarks on the Counterfeit Products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the Counterfeit Products.

78.     Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the Counterfeit Products to the general public involves the use of counterfeit marks and is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

79.     Plaintiffs have no adequate remedy at law and, if Defendants' actions are not enjoined, Plaintiffs will continue to suffer irreparable harm to their reputations and the associated goodwill of Plaintiffs' respective brands.

**COUNT III**
**VIOLATION OF ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**(815 ILCS § 510, *et seq.*)**

80. Plaintiffs hereby re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 79.

81. Defendants have engaged in acts violating Illinois law including, but not limited to, passing off their Counterfeit Products as those of Plaintiffs, causing a likelihood of confusion and/or misunderstanding as to the source of their goods, causing a likelihood of confusion and/or misunderstanding as to an affiliation, connection, or association with genuine Plaintiffs' Products, representing that their products have Plaintiffs' approval when they do not, and engaging in other conduct which creates a likelihood of confusion or misunderstanding among the public.

82. The foregoing Defendants' acts constitute a willful violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510, *et seq*.

83. Plaintiffs have no adequate remedy at law, and Defendants' conduct has caused Plaintiffs to suffer damage to their reputations and associated goodwill. Unless enjoined by the Court, Plaintiffs will suffer future irreparable harm as a direct result of Defendants' unlawful activities.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1) That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

   a. using Plaintiffs' Trademarks or any reproductions, counterfeit copies or colorable imitations thereof in any manner in connection with the distribution, marketing,

advertising, offering for sale, or sale of any product that is not a genuine Plaintiffs' Product or is not authorized by Plaintiffs to be sold in connection with Plaintiffs' Trademarks;

b.  passing off, inducing, or enabling others to sell or pass off any product as a genuine Plaintiffs' Product or any other product produced by Plaintiffs, that is not Plaintiffs' or not produced under the authorization, control, or supervision of Plaintiffs and approved by Plaintiffs for sale under Plaintiffs' Trademarks;

c.  committing any acts calculated to cause consumers to believe that Defendants' Counterfeit Products are those sold under the authorization, control or supervision of Plaintiffs, or are sponsored by, approved by, or otherwise connected with Plaintiffs;

d.  further infringing Plaintiffs' Trademarks and damaging Plaintiffs' goodwill; and

e.  manufacturing, shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Plaintiffs, nor authorized by Plaintiffs to be sold or offered for sale, and which bear any of Plaintiffs' trademarks, including the Plaintiffs' Trademarks, or any reproductions, counterfeit copies or colorable imitations thereof;

2)  Entry of an Order that, at Plaintiffs' choosing, the registrant of the Defendant Domain Names shall be changed from the current registrant to Plaintiffs, and that the domain name registries for the Defendant Domain Names, including, but not limited to, VeriSign, Inc., Neustar, Inc., Afilias Limited, CentralNic, Nominet, and the Public Interest Registry, shall unlock and change the registrar of record for the Defendant Domain Names to a registrar of Plaintiffs' selection, and that the domain name registrars, including, but not limited to, GoDaddy

Operating Company, LLC ("GoDaddy"), Name.com, PDR LTD. d/b/a PublicDomainRegistry.com ("PDR"), and Namecheap Inc. ("Namecheap"), shall take any steps necessary to transfer the Defendant Domain Names to a registrar account of Plaintiffs' selection; or that the same domain name registries shall disable the Defendant Domain Names and make them inactive and untransferable;

3) Entry of an Order that, upon Plaintiffs' request, those in privity with Defendants and those with notice of the injunction, including, without limitation, any online marketplace platforms such as iOffer, eBay, AliExpress, and Alibaba, web hosts, sponsored search engine or ad-word providers, credit cards, banks, merchant account providers, third party processors and other payment processing service providers, Internet search engines such as Google, Bing and Yahoo, and domain name registrars, including, but not limited to, GoDaddy, Name.com, PDR, and Namecheap, (collectively, the "Third Party Providers") shall:

   a. disable and cease providing services being used by Defendants, currently or in the future, to engage in the sale of goods using Plaintiffs' Trademarks;

   b. disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using Plaintiffs' Trademarks; and

   c. take all steps necessary to prevent links to the Defendant Domain Names identified on Schedule A from displaying in search results, including, but not limited to, removing links to the Defendant Domain Names from any search index;

4) That Defendants account for and pay to Plaintiffs all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for

infringement of Plaintiffs' Trademarks be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

5) In the alternative, that Plaintiffs be awarded statutory damages for willful trademark counterfeiting pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of Plaintiffs' Trademarks;

6) That Plaintiffs be awarded their reasonable attorneys' fees and costs; and

7) Award any and all other relief that this Court deems just and proper.

Dated this 11th day of April 2018.     Respectfully submitted,

<div style="margin-left:40%">

/s/ Justin R. Gaudio       
Amy C. Ziegler
Justin R. Gaudio
Jessica L. Bloodgood
Allyson M. Martin
Greer, Burns & Crain, Ltd.
300 South Wacker Drive, Suite 2500
Chicago, Illinois 60606
312.360.0080 / 312.360.9315 (facsimile)
aziegler@gbc.law
jgaudio@gbc.law
jbloodgood@gbc.law
amartin@gbc.law

*Counsel for Plaintiffs Richemont International SA, Cartier International A.G., Montblanc-Simplo GmbH, Chloe S.A.S., Van Cleef & Arpels SA, and Officine Panerai A.G.*

</div>